# Exhibit A



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

JOAKIM NOAH
Vs.
SOGECOQ SARL

C.A. No.     2013 CA 006713 B

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Lee F. Satterfield

Case Assigned to:  Judge JOHN M MOTT
Date:  October 3, 2013
Initial Conference: 10:00 am, Friday, January 03, 2014
Location:   Courtroom 221
          500 Indiana Avenue N.W.
          WASHINGTON, DC  20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Lee F. Satterfield

Caio.doc

Form CA 1-A: Notice and Acknowledgment for Service by Mail



## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

Joakim Noah
_____
    *Plaintiff(s)*

  v.         Case No: **13 - 0 0 0 6 7 1 3**

Sogecog Sarl, Le Coq Sportif Holding
_____

    *Defendant(s)*

### NOTICE

To (insert name and address of the party to be served):
Sogecoq Sarl
Aeroparc I
19 rue Icare
67960 Entzheim, France

   The enclosed summons, complaint and initial order are served pursuant to Rule 4(c)(4) of the Superior Court Rules of Civil Procedure.

   You must sign and date the Acknowledgement (below). If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate next to your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate next to your signature your authority.

   If you do not complete and return the form to the sender within twenty (20) days after it has been mailed, you (or the other party on whose behalf you are being served) may be required to pay any expenses incurred in serving a summons, complaint and initial order in any other manner permitted by law.

   If you do complete and return this form, you (or the other party on whose behalf you are being served) must answer the complaint within twenty (20) days after you have signed, dated and returned the form. If you fail to do so, judgment by default may be entered against you for the relief demanded in the complaint.

   This Notice and Acknowledgment of Receipt of Summons, Complaint and Initial Order was mailed on (insert date): October 3, 2013.

*Mark S. Levinstein*        October 3, 2013
_____    _____
*Signature*           *Date of Signature*

### ACKNOWLEDGMENT OF RECEIPT OF SUMMONS, COMPLAINT, AND INITIAL ORDER

   I (print name) _____ received a copy of the summons, complaint and initial order in the above captioned matter at (insert address): _____
_____
_____

_____  _____ _____
*Signature*       *Relationship to Defendant/Authority* *Date of Signature*
          *to Receive Service*

Para pedir una traducción, llame al (202) 879-4828  如需翻译,请打电话 (202) 879-4828  Veuillez appeler au (202) 879-4828 pour une traduction
Để có một bản dịch, hãy gọi (202) 879-4828  የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ።  번역을 원하시면, (202) 879-4828 로 전화주십시요



**Superior Court of the District of Columbia**
CIVIL DIVISION
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Joakim Noah
_____
                              Plaintiff

                    vs.

Sogecoq Sarl
_____
                              Defendant

**13-0006713**

Case Number _____

### SUMMONS

To the above named Defendant:

     You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

     You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Mark S. Levinstein
_____
Name of Plaintiff's Attorney

725 12th Street, N.W.
_____
Address
Washington, D.C.   20005

(202) 434-5012
_____
Telephone

_Clerk of the Court_

By _____
                              Deputy Clerk

Date _10/3/13_

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ.

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                             CASUM.doc

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

JOAKIM NOAH,
5 Bannockburn Court
Bannockburn, IL 60015

        Plaintiff,

  v.

SOGECOQ SARL,
Aéroparc 1
19 rue Icare
67960 Entzheim, France
Tel: 0388647500

and

LE COQ SPORTIF HOLDING,
Aéroparc 1
19 rue Icare
67960 Entzheim, France
Tel: 0388360429

        Defendants.

RECEIVED
Civil Clerk's Office
OCT 0 3 2013
Superior Court of the
District of Columbia
Washington, D.C.

**13 - 0 0 0 6 7 1 3**

Civil Action No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

### NATURE OF THE ACTION

1.    Plaintiff Joakim Noah brings this action against Defendants Sogecoq Sarl and Le Coq Sportif Holding ("LCSH") (collectively, "Le Coq Sportif") for breach of contract and against Sogecoq Sarl for breach of the duty of good faith and fair dealing. Mr. Noah and Le Coq Sportif are referred to as the "Parties."

2.    In or about September 2007, Mr. Noah and Le Coq Sportif entered into a six-year endorsement deal (the "Contract," attached as Exhibit 1 to this Complaint and Demand for Jury

Trial), pursuant to which Mr. Noah licensed to Le Coq Sportif the right to use Mr. Noah's name,

likeness, and image in the advertising and marketing of Le Coq Sportif products, and to use his

name and likeness on certain Le Coq Sportif products (the "Signature Products") for the benefit

of Sogecoq Sarl, LCSH, and Sogecoq Sarl's sister companies under LCSH.  In return, Le Coq

Sportif agreed to pay Mr. Noah $6 million in guaranteed compensation, to transfer to him eighty-

two thousand, nine hundred, and forty (82,940) shares of LCSH, and under specified

circumstances, to pay Mr. Noah additional compensation, royalties, and shares of LCSH in

exchange for, among other things, the right to use Mr. Noah's name, likeness, or image on the

Signature Products.

      3.     Initially, the Le Coq Sportif executives—including its General Manager, Mr.

Antoine Sathicq—were excited about the company's relationship with Mr. Noah and were

committed to working with him to promote the Le Coq Sportif brand and to sell the Signature

Products in the United States.  However, not long after the Contract was executed, Mr. Sathicq, a

former Adidas executive who was knowledgeable and experienced with endorsement contracts,

was terminated and replaced by new executives who were not committed to working with Mr.

Noah, who closed the Le Coq Sportif operations in the United States, and who were not

committed to promoting the Le Coq Sportif brand or the Signature Products in the United States.

These new executives included Mr. Marc-Henri Beausire, who, upon information and belief, is

an owner of Le Coq Sportif and its parent companies.  Mr. Beausire terminated Mr. Sathicq, and

assumed operational control of Le Coq Sportif.  Given the new executives' lack of experience

and lack of commitment to the United States market, the new executives perceived Le Coq

Sportif's obligations to Mr. Noah and the cash and stock Le Coq Sportif had promised to pay Mr.

Noah as errors of prior management and liabilities they wanted to try to avoid.  When their

proposals to reduce the amounts due to Mr. Noah were not accepted, they decided to find ways not to honor Le Coq Sportif's obligations under the Contract. Le Coq Sportif made some of the payments due under the Contract, but as the parties approached the end of the six-year Contract, the payments were made later and later, and Le Coq Sportif failed to give Mr. Noah reports about sales of Signature Products, all in breach of the contract. Le Coq Sportif then manufactured excuses for not paying the amounts due under the Contract.

4.      This action is being filed to obtain a judgment against Le Coq Sportif for the compensation (including shares of LCSH) due to Mr. Noah under the terms of the Contract.

## PARTIES AND JURISDICTION

5.      Plaintiff Joakim Noah is a professional basketball player who plays for the Chicago Bulls in the National Basketball Association ("NBA") and for the French National Team. He resides at 5 Bannockburn Court, Bannockburn, IL 60015. Mr. Noah's agent is Mr. Donald Dell of Lagardere Unlimited, 5335 Wisconsin Avenue, N.W., Suite 850, Washington, DC 20015.

6.      Defendant Sogecoq Sarl is a French private limited liability company, and its registered office is at Aéroparc 1, 19 rue Icare, 67960 Entzheim, France. Upon information and belief, it is a subsidiary of Defendant LCSH.

7.      Defendant LCSH is a French private limited liability company, and its registered office is at Aéroparc 1, 19 rue Icare, 67960 Entzheim, France. Upon information and belief, it is the parent company of Defendant Sogecoq Sarl.

8.      This court has jurisdiction over this action and the parties pursuant to D.C. Code §§ 11-921 and 13-423, and according to the Contract's forum selection clause, which provides:

> The party initiating the proceeding shall determine the forum
> where the litigation will be conducted, i.e.:

3

If the proceeding is started by [Mr. Noah], the litigation will be held under the United States of America's laws and jurisdiction is expressly assigned to a competent court in Washington, District of Columbia (USA).

Article 14. Mr. Noah is the party initiating the proceeding as provided in the Contract.

## FACTUAL ALLEGATIONS

### Le Coq Sportif's Contract with Mr. Noah

9.      On September 15, 2007, Mr. Noah and Sogecoq Sarl entered into an exclusive contract by which Mr. Noah licensed to Sogecoq Sarl his name and image for the marketing and sale of Le Coq Sportif's textile products, shoes, and accessories, to the benefit of Sogecoq Sarl and its sister companies and their parent, LCSH.  Mr. Dell and Mr. Noah negotiated with representatives of Sogecoq Sarl and LCSH who had apparent and actual authority to bind both Sogecoq Sarl and LCSH to the terms of the Contract, and Mr. Sathicq executed the Contract on behalf of both entities.  The contractual period commenced on October 1, 2007, and ended on September 30, 2013.

10.     The Contract (Ex. 1) provides Le Coq Sportif:

> The **exclusive right** to use the RIGHTS OF THE PERSONALITY to ensure the growth and promotion of the "Le Coq Sportif" brand(s), the PRODUCTS and, more specifically, the lines, which will be developed for this purpose in the TERRITORY and the CATEGORY.

Article 2 ¶ 2 (bolded words and capital letters in original).

11.     In exchange for granting Le Coq Sportif the exclusive right to associate its textile products, shoes, and accessories with Mr. Noah's name, likeness, and image, Le Coq Sportif agreed to pay Mr. Noah the following guaranteed compensation:

> First year: 500,000.00 $ (five hundred thousand US dollars)
> Second year: 600,000.00 $ (six hundred thousand US dollars)

4

> Third year: 700,000.00 $ (seven hundred thousand US dollars)
> Fourth year: 1,400,000.00 $ (one million four hundred thousand US dollars)
> Fifth year: 1,400,000.00 $ (one million four hundred thousand US dollars)
> Sixth year: 1,400,000.00 $ (one million four hundred thousand US dollars)

Article 6.1.1(i).

12.     The Contract further granted Mr. Noah the right to variable compensation up to $150,000 depending on the outcome of certain awards and achievements during his first and second years playing in the NBA.  Article 6.1.1(ii).

13.     Moreover, the Contract guaranteed Mr. Noah eighty-two thousand, nine hundred, and twenty (82,920) shares of LCSH and the possibility of an additional thirteen thousand, eight hundred, and twenty-one (13,821) shares of LCSH if Mr. Noah's Contract were renewed. Article 6.1.2.4.

14.     Le Coq Sportif was also "entitled to create and distribute a 'Manga' cartoon" based on Mr. Noah.  Any revenues from the sale of the cartoon could be either distributed to charity or kept by Mr. Noah, at his discretion.  Article 3.4.

15.     Finally, Mr. Noah was entitled to:

> [A] royalty equal to 5% of the pre-tax turnover obtained (i.e. the net amount, excluding taxes invoiced and collected) by LE COQ SPORTIF or its sister companies, in relation with the sale in the TERRITORY of the sole "Le Coq Sportif" line of products (limited to textiles, shoes and accessories) branded with the name "Joaquim NOAH" or a logo or a surname identifying [Mr. Noah] (used alone or associated with the brand "Le Coq Sportif").

Article 4 ¶ 5.

16.     The Contract sets forth a payment schedule, including a deferred amount of $1.2 million to be paid in three $400,000 installments on November 15 of 2013, 2014, and 2015. Article 6.1.2.1.

17.     Regarding disputes, the Contract provides, in relevant part:

> In the event of any dispute or difference arising out of or relating to this Agreement or the breach thereof, the parties hereto shall use their best efforts to amicably settle such disputes or differences. To this effect, the parties agree to consult and negotiate with each other in good faith toward reaching a just and equitable solution satisfactory to all parties. Should the parties be unable to reach a solution within a period of thirty (30) calendar days after commencement of discussions (discussions to begin on the day notice is given) then all disputes or differences arising in connection with this Agreement shall be settled under the following rule:
>
> The party initiating the proceeding shall determine the forum where the litigation will be conducted, i.e.:
>
> If the proceeding is started by [Mr. Noah], the litigation will be held under the United States of America's laws and jurisdiction is expressly assigned to a competent court in Washington, District of Columbia (USA). . . .

Article 14.

### Le Coq Sportif's Breach of the Contract with Mr. Noah

18.     Mr. Noah performed his obligations under the Contract, including wearing Le Coq Sportif's shoes in every NBA game despite Mr. Noah's strongly held belief that the Le Coq Sportif shoes were not well designed and likely contributed to his development of plantar fasciitis, which caused him to miss several games during the 2012-13 Chicago Bulls NBA season, including key games in the NBA play-offs.

19.     Mr. Noah has worn Le Coq Sportif's Signature Products during every NBA game in which he played, including NBA All-Star games, since the commencement of the Contract.

20.     Despite the primary purpose of the Contract being to promote Mr. Noah and Le Coq Sportif in the United States and the contractual obligation "to work together very closely to define a precise growth strategy" (Article 5.2) and for Le Coq Sportif to "earmark a COMMUNICATION BUDGET . . . for communications actions aimed primarily at promoting the specific products and the RIGHTS OF THE PERSONALITY" (Article 5.3 (capital letters in original)), Le Coq Sportif terminated its experienced management and closed its North American office shortly after entering into the Contract with Mr. Noah, never replaced the terminated management with personnel knowledgeable about the marketing of sports-related apparel, and never developed a comprehensive strategy for the marketing and sale in North America of the Signature Products bearing Mr. Noah's name, likeness, and image.  Such failure by Le Coq Sportif in North America, where Mr. Noah lives, plays NBA basketball, and has his primary fan base, has resulted in very substantial lost royalties to Mr. Noah.

21.     Mr. Noah performed his obligations under the Contract despite multiple breaches of the Contract by Le Coq Sportif, including but not limited to failure to pay amounts due on time, and failure to submit uses of Mr. Noah's name, likeness, and image to Mr. Noah for his prior written consent.  The new Le Coq Sportif management erroneously perceived the Contract as unfair and a financial burden, accused Mr. Dell of negotiating a Contract that was too generous for Mr. Noah, and demanded to see offers Mr. Noah had received from other corporations who produce products competitive with Le Coq Sportif's products.  Mr. Dell showed them that Mr. Noah was a very valuable product endorser and had been offered comparable deals by competing corporations, but the new Le Coq Sportif management remained committed to finding ways not to honor the promises Le Coq Sportif had made.  As a result, Le Coq Sportif was not committed to performing its obligations under the Contract, it made all

7

payments late, it did not provide reports required by the Contract, it did not work to promote Mr. Noah or his brand and image, and it complained bitterly about the amounts it was required to pay.

22.     Without notice to Mr. Noah, Le Coq Sportif failed to pay the contractually obligated amount of $250,000 on June 15, 2013.

23.     On July 24, 2013, and then again on August 5, 2013, Mr. Noah and his representative, Mr. Dell, gave Le Coq Sportif and its representatives notice that there was a dispute and differences between and among the parties. The parties consulted and negotiated with each other, Mr. Noah in good faith, and Le Coq Sportif in bad faith. Le Coq Sportif made several unreasonable and arbitrary demands in an effort to escape paying Mr. Noah the contractually mandated amounts he is owed.

24.     Mr. Noah and his representatives asked for assurances that Le Coq Sportif would honor its obligations under the Contract, but Le Coq Sportif refused to provide such assurances.

25.     The parties were unable to reach a resolution within a period of thirty (30) calendar days after commencement of discussions.

26.     Le Coq Sportif failed to pay the contractually mandated amount of $250,000 to Mr. Noah on September 15, 2013.

27.     Le Coq Sportif failed to transfer the contractually mandated twenty-seven thousand, six-hundred, and forty (27,640) shares of LCSH to Mr. Noah by September 30, 2013.

28.     At all times, Mr. Noah continued to perform under the Contract.

29.     Mr. Noah has commenced this proceeding, and the litigation will be held in a competent court in the District of Columbia.

## COUNT I
### (Breach of Contract by Sogecoq Sarl)

30.     Mr. Noah repeats, realleges, and incorporates by reference the allegations of the preceding paragraphs 1-29 as if set forth in full herein.

31.     The Contract of September 15, 2007 constituted an offer made by Sogecoq Sarl that was accepted by Mr. Noah and thereby established a binding contractual relationship between Mr. Noah and Sogecoq Sarl.

32.     Mr. Noah has acted in accordance with his obligations under the Contract despite Sogecoq Sarl's breaches and the physical hardships he endured as a result of the use of Le Coq Sportif's products.

33.     By withholding, and continuing to withhold, contractually mandated payments to Mr. Noah, refusing to confirm that it will make the deferred compensation payments due to Mr. Noah, and failing to provide reports of sales of Signature Products or pay amounts due to Mr. Noah as a result, Sogecoq Sarl has breached the Contract.

34.     By withholding, and continuing to withhold, contractually mandated transfer of shares to Mr. Noah, Sogecoq Sarl has breached the Contract.

35.     Mr. Noah has been damaged by the breaches of the Contract by Sogecoq Sarl.

36.     This Court should order transfer of the LCSH shares to Mr. Noah because there is not an adequate remedy at law.

WHEREFORE, Mr. Noah demands judgment in his favor and against Sogecoq Sarl for (1) damages of more than $1.65 million, in the amounts proved at trial, plus interest and costs of collection; (2) specific performance of the Contract with regard to the transfer to Mr. Noah of the shares of LSCH to which he is entitled under the Contract, and (3) such other and further relief as this Court may deem just and proper.

## COUNT II
### (Breach of Contract by LCSH)

37.     Mr. Noah repeats, realleges, and incorporates by reference the allegations of the preceding paragraphs 1-36 as if set forth in full herein.

38.     The Contract of September 15, 2007 constituted an offer made by Sogecoq Sarl on behalf of Sogecoq Sarl and, acting as an authorized agent of LCSH, on behalf of LCSH that was accepted by Mr. Noah and benefitted LCSH and thereby established a binding contractual relationship between Mr. Noah and LCSH.

39.     Mr. Noah has acted in accordance with his obligations under the Contract to the benefit of LCSH despite the physical hardships he endured as a result of the use of Le Coq Sportif's products.

40.     By refusing to make or cause its agent, Sogecoq Sarl, to make the contractually mandated payments to Mr. Noah, refusing to confirm or cause Sogecoq Sarl to confirm that it will make the deferred compensation payments due to Mr. Noah, and failing to provide or cause Sogecoq Sarl to provide reports of sales of Signature Products or pay amounts due to Mr. Noah as a result, LCSH has breached the Contract.

41.     By refusing to make or cause its agent, Sogecoq Sarl, to make the contractually mandated transfer of shares to Mr. Noah, LCSH has breached its obligations under the Contract.

42.     Mr. Noah has been damaged by the breach of the Contract by LCSH.

43.     This Court should order transfer of the LCSH shares to Mr. Noah because there is not an adequate remedy at law.

WHEREFORE, Mr. Noah demands judgment in his favor and against LCSH for (1) damages of more than $1.65 million, in the amounts proved at trial, plus interest and costs of collection; (2) specific performance of the Contract with regard to the transfer to Mr. Noah of the

shares of LSCH to which he is entitled under the Contract, and (3) such other and further relief as this Court may deem just and proper.

## COUNT III
### (Breach of Duty of Good Faith and Fair Dealing by Sogecoq Sarl)

44.     Mr. Noah repeats, realleges, and incorporates by reference the allegations of the preceding paragraphs 1-43 as if set forth in full herein.

45.     Under District of Columbia law, there is an implied duty of good faith and fair dealing in every contract.

46.     Sogecoq Sarl breached its duty of good faith and fair dealing when it intentionally, purposely, arbitrarily, and without notice, withheld reports, payments, and shares due to Mr. Noah under the contract.

47.     Mr. Noah has been damaged by Sogecoq Sarl's breach of the duty of good faith and fair dealing.

WHEREFORE, Mr. Noah demands judgment in his favor and against Sogecoq Sarl for (1) damages of more than $1.65 million, in the amounts proved at trial, plus interest and costs of collection; (2) specific performance of the Contract with regard to transfer to Mr. Noah of the shares of LSCH to which he is entitled under the Contract; and (3) such other and further relief as this Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Noah respectfully requests that this Court:

a.     Order Le Coq Sportif to pay an award of compensatory and consequential damages of more than $1.65 million, in the amounts to be proved at trial, plus interest and costs of collection;

      b.     Issue a declaratory judgment that all payments, including deferred future payments, required by Le Coq Sportif under the Contract shall be made to Mr. Noah when due;

      c.     Order Le Coq Sportif to transfer the contractually mandated shares to Mr. Noah; and

      d.     Grant such other and further relief as the court may deem just and proper, including, but not limited to, prejudgment interest and payment of Mr. Noah's reasonable costs and attorneys' fees.

## DEMAND FOR JURY TRIAL

Mr. Noah demands a jury trial before a jury of twelve members on all issues so triable.

Dated: October 3, 2013

                  Respectfully submitted,

                  WILLIAMS & CONNOLLY LLP

                  By: *Mark S. Levinstein*
                  Mark S. Levinstein (D.C. Bar No. 369613)
                  Embry J. Kidd (D.C. Bar No. 989586)

                  725 Twelfth Street, N.W.
                  Washington, D.C. 20005
                  (202) 434-5000
                  (202) 434-5029 (facsimile)
                  MLevinstein@wc.com
                  EKidd@wc.com

                  *Counsel for Plaintiff Joakim Noah*

# EXHIBIT 1

# PARTNERSHIP CONTRACT

By and between

**SOGECOQ SARL,** a private limited liability company with capital of EUR 75,000.00, having its registered office at Aéroparc 1, 19 rue Icare, 67960 Entzheim, France, registered with the Strasbourg Company Register under N°. 399 625 128.

Represented by its "General Manager", Mr Antoine SATHICQ,

Hereinafter referred to as "LE COQ SPORTIF"

First party,

And

M. Joaquim NOAH
A professional NBA basketball player.

Hereinafter referred to as "PARTNER" or "Joaquim NOAH"

Second party,

In presence of:

**SFX MEDIA & EVENTS,** having its headquarters at 5335 Wisconsin Avenue, Suite 850, Washington DC, USA,

Represented by its "President", M. Donald L. Dell,

Hereinafter referred to as "AGENT"

## RECITALS

Whereas LE COQ SPORTIF manufactures and distributes sport and fashion textiles, footwear and accessories under the trademark "Le Coq Sportif" (hereinafter the PRODUCTS), an area in which it has acquired recognised experience and professional expertise;



Whereas Mr Joaquim NOAH is a very well known professional basketball player, drafted by the Chicago Bulls and has a very positive image in the areas of basketball and sport in general and the values conveyed by Mr Joaquim NOAH, through his image, his athletic and human challenges, are fully consistent with those of the "Le Coq Sportif" brand;

Whereas LE COQ SPORTIF wishes to include Mr Joaquim NOAH in the promotion and development of its PRODUCTS and its corporate strategy;

Whereas LE COQ SPORTIF wishes to be able to make use of Mr Joaquim NOAH's name and image for the sale and promotion of its PRODUCTS and to obtain a license of the name/brand "Joaquim NOAH" in relation with the manufacture and sale of a specific line of products (limited to textiles, footwear and accessories);

Whereas the PARTNER is the sole holder of the rights to exploit his image and the PARTNER is entirely free to grant the rights related thereto.

The parties have agreed as follows:

## ARTICLE 1 – DEFINITIONS

(1) The term "TERRITORY" means worldwide.

(2) The term "CATEGORY" means every category of sport disciplines and every category of clothing, i.e. sporting clothing, street wears, and fashion clothing, including textiles (including socks and hats), footwear and sport bags but excluding formal clothing (like suits, ties, tuxedo etc.) and non sport bags (like luggage).

(3) The term "PRODUCTS" means all of the textile products, shoes and accessories (as bags) bearing the "Le Coq Sportif" brand name(s), manufactured and marketed by LE COQ SPORTIF in the sport and fashion areas.

(4) The term "CONTRACTUAL PERIOD" means the period commencing on October 1, 2007 and ending on September 30, 2013.

(5) The term "RIGHTS OF THE PERSONALITY" covers any word or any symbol or any photographic or graphic representation or any combination of these elements that identify Mr Joaquim NOAH, including the latter's family name, first name, initials, autograph, signature(s), image and voice.

(6) The term "EQUIPMENTS" means all sport and fashion textiles, shoes and equipment bearing the "Le Coq Sportif" brand(s), chosen in the collections developed by LE COQ SPORTIF and constituting the

contribution provided by LE COQ SPORTIF to Mr Joaquim NOAH, in order to enable the latter to ensure the visibility of the "Le Coq Sportif" brand(s).

(7) The term "COMMUNICATIONS BUDGET" means the annual budget made available by LE COQ SPORTIF, which will be made to promote the RIGHTS OF THE PERSONALITY. The PARTNER shall be involved in all of the strategic decisions associated with the use of the COMMUNICATION BUDGET.

## ARTICLE 2 – SUBJECT MATTER

The PARTNER hereby grants LE COQ SPORTIF, which accepts:

The **exclusive right** to use the RIGHTS OF THE PERSONALITY to ensure the growth and promotion of the "Le Coq Sportif" brand(s), the PRODUCTS and, more specifically, the lines, which will be developed for this purpose in the TERRITORY and the CATEGORY.

If agreed by the PARTNER in writing, LE COQ SPORTIF could also be authorised to use the name "*Joaquim Noah*" on a specific line of footwear, textiles and accessories, as bags.

In order to avoid any ambiguities, "**exclusive right**" means that the PARTNER will not grant the rights hereby granted to LE COQ SPORTIF to another company or to a third party developing, selling and marketing products similar to the PRODUCTS, as any sport and/or fashion brand's owner (excluding formal clothing and non sport bags), without LE COQ SPORTIF's prior approval, approval which cannot be unreasonably withheld. However, the PARTNER shall be fully free to grant said rights to companies or third parties developing products resulting from another categories of activity than the PRODUCTS and the CATEGORY, as for examples men products (shampoo, perfumes), sunglasses, food, drinks etc.

The use of the RIGHTS OF THE PERSONALITY also entails the active participation of Mr Joaquim NOAH in the growth of the "Le Coq Sportif" brand(s). Said participation shall be defined below and shall include Mr Joaquim NOAH making available to LE COQ SPORTIF of his expertise, knowledge (in particular, in the CATEGORY), advice and analyses.

## ARTICLE 3 – PARTNER'S OBLIGATIONS

3.1  The PARTNER grants LE COQ SPORTIF the exclusive right, in the CATEGORY and in the TERRITORY, to use and to publish the RIGHTS OF THE PERSONALITY:

3.

- in its advertisements, advertising materials and/or external promotion: catalogues, leaflets, brochures, films, videos, posters, postcards and other promotional articles,
- in internal communications: the intranet, newspapers, newsletters, and videos,
- in consumer magazines, newspapers, direct mail, posters, catalogues, brochures, and point-of-sales exhibitions,
- in television advertising, commercials, videos and by mobile messages (MMS),
- in the official sites of LE COQ SPORTIF on the Internet and, in particular, in direct interactive marketing on the Internet (surveys, chats, games, blogs, etc.)
- for the specific needs of LE COQ SPORTIF or in association with its clients, sports retailers and partner companies, for cooperative or promotional advertising,
- in a "Manga" cartoon specifically developed for this partnership,
- On a specific line of products and/or PRODUCTS.

3.2. All advertising and promotional materials manufactured for these purposes are and shall remain the exclusive property of LE COQ SPORTIF, the PARTNER shall not have any right, title or interest of any nature whatsoever in or on said materials or any component, element or reproduction thereof. No specific compensation shall be due for the same, except for the expenses incurred concerning this document.

3.3 The PARTNER will insure his personal participation up to ten (10) days of collaboration per contract year, to promote the LE COQ SPORTIF strategy for its brand(s) in the broad sense and to develop the PRODUCTS. If LE COQ SPORTIF's needs, for a specific contract year, will exceed ten (10) days, the PARTNER agrees to use its best effort to insure his personal participation to two (2) extra days. The dates of these collaboration days will be determined by joint agreement based on the availability of Mr Joaquim NOAH, as well as on his professional obligations and schedules which remained a priority. In this framework, LE COQ SPORTIF agrees to concentrate its requests of days of collaboration during each PARTNER's professional's breaks and more particularly between two NBA seasons.

It is agreed to specify that the term "day of collaboration" means any press operation, any business meeting and/or any public events, such as fairs, shows, exhibitions, autograph-signing sessions, participation in a film, product testing sessions, any photographic session, advertising and promotional campaign, radio or television spot or participation in event-based operations organised by LE COQ SPORTIF, in particular in the CATEGORY or on its Internet sites.

Each day of collaboration will be up to eight (8) hours per day.



The days that have not been used by LE COQ SPORTIF for a contractual year cannot be carried forward to the following contractual year.

3.4 In the framework of this partnership, LE COQ SPORTIF is entitled to create and distribute a "Manga" cartoon based on the RIGHTS OF THE PERSONALITY. LE COQ SPORTIF and the PARTNER agree that the revenues realized by the sale of this cartoon may be, at PARTNER's own discretion:

> (i) Devoted to the benefit of a charitable foundation chosen by the PARTNER, as, if he wants so, the LE COQ SPORTIF's foundation; or
> (ii) Kept by the PARTNER.

## ARTICLE 4 – LICENSE

The PARTNER grants LE COQ SPORTIF a license of the name "*Joaquim NOAH*" in relation with the manufacture and sale of a specific "Le Coq Sportif" line (limited to footwear, textiles and accessories, as bags) co-branded "*Le Coq Sportif / Joaquim NOAH*" or only branded "*Joaquim NOAH*" which may be developed during the CONTRACTUAL PERIOD by LE COQ SPORTIF.

It is clearly agreed between parties that LE COQ SPORTIF is not allowed to use the name "*Joaquim NOAH*" on any other products or matters than the ones mentioned in this Agreement.

LE COQ SPORTIF agrees to not register a brand "*Joaquim NOAH*" or any other brands reproducing the name of Mr Joaquim NOAH in any place in the world, for any products and services.

LE COQ SPORTIF is not authorized to grant any sub-license of the name "*Joaquim NOAH*" and will not assign or transfer this sub-license to any other entity, except to its sister companies, owned by the LE COQ SPORTIF Group. Also in this last case, LE COQ SPORTIF will have to obtain PARTNER's prior approval, which cannot be unreasonably withheld.

LE COQ SPORTIF guarantees PARTNER to develop, manufacture and sale a specific "Le Coq Sportif" line of at least 2 - 3 pairs of shoes and in any case, limited to footwear, textiles and accessories (as bags) branded with the name "*Joaquim NOAH*" and/or a specific logo or surname identifying the PARTNER (used alone or associated with the brand "Le Coq Soprtif"). In this framework PARTNER agrees, as a first step, to register his name and/or logo and/or surnames, as a brand in the territories and classes permitting their use by LE COQ SPORTIF. LE COQ SPORTIF agrees to pay to the PARTNER a royalty equal to 5% of the pre-tax turnover obtained (i.e. the net amount, excluding taxes, invoiced and collected) by LE COQ SPORTIF or its sister



companies, in relation with the sale in the TERRITORY of the sole "Le Coq Sportif" line of products (limited to textiles, shoes and accessories) branded with the name "*Joaquim NOAH*" or a logo or a surname identifying the PARTNER (used alone or associated with the brand "Le Coq Sportif").

Within 30 (thirty) days (at most) following the end of each calendar six-month period following the first sales of this specific "Le Coq Sportif" line of products branded "*Joaquim NOAH*", LE COQ SPORTIF shall send the PARTNER a detailed statement of its turnover from the sales invoiced and collected from this specific "Le Coq Sportif" line branded "*Joaquim NOAH*" made during the six-month period ended and will enclose with the latter a payment of the 5% royalty due for the period in question. The PARTNER will send the corresponding receipt to LE COQ SPORTIF as quickly as possible in order to regularize the effectuated payments.

Should PARTNER wish to check the truthfulness and accuracy of the LE COQ SPORTIF's statements linked to its sales of products branded "*Joaquim NOAH*", he may -- at any time throughout this contract's term and up to one year from the end of the contractual term, via a chartered accountant of his choice -- carry out an audit of the LE COQ SPORTIF's compliance with the implementation of this license.

PARTNER must notify LE COQ SPORTIF by registered mail with return receipt, and may only commence said audit 15 (fifteen) days after sending this notification.

The parties shall immediately adjust their accounts in the event that the audit result indicates that the turnover obtained during the audited year differs from the turnover declared by LE COQ SPORTIF for the same period.

In addition, if the audit result shows that the turnover obtained during the period audited exceeds by more than 5% (five percent) the turnover declared by LE COQ SPORTIF for the same period, the audit's expenses shall be borne by LE COQ SPORTIF as a penalty.   Otherwise, the audit's expenses shall be borne by PARTNER.

## ARTICLE 5 – OBLIGATIONS OF LE COQ SPORTIF

5.1    LE COQ SPORTIF agrees to use the RIGHTS OF THE PERSONALITY under the rules of this Agreement and in the strict respect of the rights of the personality and morality.

5.2    LE COQ SPORTIF must submit any and all uses of the RIGHTS OF THE PERSONALITY to the PARTNER for the latter's prior written consent. To this end, LE COQ SPORTIF must send the PARTNER on a timely basis all appropriate elements and, more specifically, any models of any advertising medium in which the RIGHTS OF THE PERSONALITY are represented for his consent. The PARTNER undertakes to reply to LE COQ SPORTIF's request within at most seven (7) business days from the

6

submission of the medium and he cannot refuse to give his consent without genuine, serious grounds. However, should PARTNER fail to reply within the aforementioned timeframe, PARTNER shall be deemed to have given its full and complete consent.

Regardless of the circumstances, it is specified that LE COQ SPORTIF on the one hand and the PARTNER on the other undertake to work together very closely to define a precise growth strategy, prior to any design of specific products and the use of the RIGHTS OF THE PERSONALITY for advertising purposes, as an example in order to develop and work together in the logos conception linked to the PARTNER's identification.

5.3    LE COQ SPORTIF undertakes to earmark a COMMUNICATION BUDGET, fixed at its own discretion for each contractual year, for communications actions aimed primarily at promoting the specific products and the RIGHTS OF THE PERSONALITY. The communications strategy, the communications plan and the corresponding communications actions will be determined by joint agreement between LE COQ SPORTIF and the PARTNER.

5.4    LE COQ SPORTIF shall appoint a manager (at the signature date of this Agreement, M. Patrick OUYI) to monitor the work stipulated herein. This manager will be the PARTNER'S day-to-day contact for the purpose of co-ordinating as effectively as possible the communications actions and strategies.

5.6    LE COQ SPORTIF undertakes to reimburse the PARTNER, subject to submission of receipts, for all travel expenses (including business class aeroplane tickets), as well as his reasonable hotel and meal expenses, that he will incur with respect of the direct LE COQ SPORTIF's requests in application of this Agreement, as well as all the expenses that the PARTNER will incur during the collaboration days aforementioned in point 3.3.

## ARTICLE 6 – Financial and EQUIPEMENTS

In exchange for the commitments undertaken by the PARTNER, LE COQ SPORTIF undertakes to grant the PARTNER with the following financial benefits, in the form of a basic remuneration, a variable performance-related remuneration depending on the PARTNER's results, shares from the Le Coq Sportif Holding – LCSH capital and the EQUIPEMENTS mentioned below:

6.1 Basic remuneration, variable remuneration and shares:

6.1.1 Remuneration and shares:

(i) Basic remuneration:

The PARTNER shall receive the following basic remuneration for each contractual year:

- First year: 500,000.00 $ (five hundred thousand US dollars)
- Second year: 600,000.00 $ (six hundred thousand US dollars)
- Third year: 700,000.00 $ (seven hundred thousand US dollars)
- Fourth year: 1,400,000.00 $ (one million four hundred thousand US dollars)
- Fifth year: 1,400,000.00 $ (one million four hundred thousand US dollars)
- Sixth year: 1,400,000.00 $ (one million four hundred thousand US dollars)

(ii) Variable remuneration depending on the PARTNER's results:

The below variable remuneration is based on the PARTNER's rookie years and consequently concerned only the first and second contractual years:

First year (2007/2008):

- Rookie of the year: 150,000.00 $ (one hundred fifty thousand US dollars)
- NBA 1st Team All-Rookie: 100,000.00 $ (one hundred thousand US dollars)
- NBA 2d Team All-Rookie: 50,000.00 $ (fifty thousand US dollars)
- 2008 NBA Rookie Game Participant: 25,000.00 $ (twenty five thousand US dollars)
- 2008 NBA Rookie Game MVP: 50,000.00 $ (fifty thousand US dollars)

Second year (2008/2009):

- 2009 NBA Rookie/Sophomore Game: 25,000.00 $ (twenty five thousand US dollars)
- 2009 NBA Rookie/Sophomore MVP: 50,000.00 $ (fifty thousand US dollars)

In the case of the afore-mentioned variable remunerations, it is agreed by parties that these bonuses would not be cumulative and only the first amount corresponding to the highest ranking would be paid.

(iii) Shares:

LE COQ SPORTIF has the wish to involve the PARTNER in its long term development and marketing strategies, among others by using the benefit of the RIGHTS OF THE PERSONALITY, the PARTNER's knowledge in the CATEGORY and the PARTNER's quality of "citizen of the world".

In this framework, LE COQ SPORTIF agrees to grant to the PARTNER a maximal number of shares of 96,741 of the company LE COQ SPORTIF Holding – LCSH, a French private limited liability company with, at the signature date of this Agreement, a capital of Euros 19,071,931.20 divided in 2,764,048 shares. These

shares will be gradually attributed to the PARTNER following the conditions stated below in point 6.1.2.4.

(iv) It is precised that the PARTNER will also receive the payment of the royalty rate stated in Article 4, herein, based on the turnover realized by the sales of products branded "*Joaquim NOAH*".

6.1.2 <u>Payment of remuneration and shares attribution:</u>

6.1.2.1 <u>Payment of basic remuneration:</u>

Payment of basic remuneration shall be spread out as follows for each contractual year:

- First year: 250,000.00 $ on January 15, 2008 and 250,000.00 $ on July 15, 2008.
- Second year: 150,000.00 $ on December 15, 2008; 150,000.00 $ on March 15, 2009; 150,000.00 $ on June 15, 2009 and 150,000.00 $ on September 15, 2009.
- Third year: 175,000.00 $ on December 15, 2009; 175,000.00 $ on March 15, 2010; 175,000.00 $ on June 15, 2010 and 175,000.00 $ on September 15, 2010.
- Fourth year: 250,000.00 $ on December 15, 2010; 250,000.00 $ on March 15, 2011; 250,000.00 $ on June 15, 2011 and 250,000.00 $ on September 15, 2011.
- Fifth year: 250,000.00 $ on December 15, 2011; 250,000.00 $ on March 15, 2012; 250,000.00 $ on June 15, 2012 and 250,000.00 $ on September 15, 2012.
- Sixth year: 250,000.00 $ on December 15, 2012; 250,000.00 $ on March 15, 2013; 250,000.00 $ on June 15, 2013 and 250,000.00 $ on September 15, 2013.

Parties jointly agree to defer the payment of the remaining part of the basic remuneration ("Deferred Payments") due for the fourth, fifth and sixth years as follows (i.e parties agree to have a CONTRACTUAL PERIOD of 6 years and a payment period of 9 years):

- November 15, 2013: 400,000.00 $
- November 15, 2014: 400,000.00 $
- November 15, 2015: 400,000.00 $

The Deferred Payments are equal to a fix amount of 1,200,000.00 $ with no interest.

The payment of each instalment shall be made by LE COQ SPORTIF to the PARTNER at the above-mentioned due dates and after receipt of the invoices relative to these basics sums.

6.1.2.2 Payment of performance-related remuneration depending on the PARTNER's results:

PARTNER shall inform LE COQ SPORTIF about the realization of every results entitling to the afore-said variable performance-based remuneration and transmit the invoice corresponding to the highest variable amount. Payment of the afore-said remuneration shall take place by LE COQ SPORTIF to the PARTNER within 60 (sixty) days of receipt of the invoice relating to the highest variable amount.

6.1.2.3 Payments:

LE COQ SPORTIF expressly undertakes to pay the amounts of remuneration due to the PARTNER indicated in the above article 6.1, with a wire transfer done directly into the bank account opened in the name of PARTNER.

6.1.2.4. Shares attribution:

LE COQ SPORTIF would gradually grant to the PARTNER 96.741 shares of the company LE COQ SPORTIF Holding – LCSH as follows:

(i) During the next LE COQ SPORTIF Holding – LCSH's shareholders meeting and in any case on or before June 30, 2008, the PARTNER would receive 55.280 shares of the company LE COQ SPORTIF Holding – LCSH.

Regarding these 55.280 shares PARTNER would have the option, applicable only within the three (3) months period starting from October 1, 2010 and ending on December 31, 2010 to:

a) Sale back the granted shares to LE COQ SPORTIF at the agreed fixed price of $ 2,000,000.00 (two millions US Dollars); or

b) Keep these shares after December 31, 2010 and remain shareholder of the company LE COQ SPORTIF Holding – LCSH, with the acceptance of all the rules applicable to LE COQ SPORTIF Holding – LCSH's shareholders.

(ii) At the end of the sixth year, i.e. at the latest on September 30, 2013, the PARTNER would receive 27.640 shares of the company LE COQ SPORTIF Holding - LCSH, without any guarantee in value and/or specific option.

(iii) At the beginning of the seventh year, i.e. in case of renewal of this Agreement, the PARTNER would receive 13.821 shares of the company LE COQ SPORTIF Holding - LCSH, without any guarantee in value and/or specific option.

Ounce received, each share will grant to PARTNER all the rights applicable to LE COQ SPORTIF Holding – LCSH's shareholders and more particularly a pre-emptive right, i.e. the right to participate to each increase of capital and to



purchase a number of issued shares corresponding to his capital detention, under the rules fixed for each increase of capital. It is however précised that this pre-emptive right is submitted to three exceptions: (1) if the shares are issued to purchase another businesses or assets (2) if the shares are issued in an IPO (3) if the issued shares are part of an employee equity incentive plan. Under these three exceptions the aforementioned pre-emptive right will not be applicable.

It is also agreed by parties that in case of renewal of this Agreement, i.e. if the PARTNER has received the total of 96.741 shares granted following the aforementioned points 6.1.2.4 (i), (ii) and (iii), PARTNER would obtain the right, applicable at any time through the termination of the renewed contractual period to evaluate the fair market value of his outstanding shares and to apply the following rules:

(1) After having obtained a fair market evaluation of his shares by an outside appraiser, PARTNER will be able to propose to LE COQ SPORTIF to purchase these shares at the price proposed by said appraiser, i.e. "the First Offer".
(2) Ounce received this "First Offer" LE COQ SPORTIF will have the basic right, under its own discretion to: (i) buy PARTNER's shares under the First Offer price or (ii) simply refuse this First Offer and not buy PARTNER's shares.
(3) If LE COQ SPORTIF would refuse the First Offer, PARTNER would have the right to sell his shares to any third party under the same conditions of the First Offer.

## 6.2. Supply of EQUIPMENTS:

LE COQ SPORTIF undertakes to provide the PARTNER, for each contractual year, a supply of EQUIPEMENTS of $ 20,000.00 (twenty thousand US dollars at LE COQ SPORTIF's "distributor price") or more if requested by PARTNER and accepted by LE COQ SPORTIF, in order to permit to the PARTNER to wear PRODUCTS during its activity of professional basketball player and any other circumstances and to use a part of this supply for his personal needs (gifts and others).

In this framework, the PARTNER agrees to exclusively wear the supplied EQUIPEMENTS and more particularly the footwear PRODUCTS, during its professional activity of basketball player (i.e. official and unofficial games, trainings, exhibitions, others) played with his franchise in NBA and/or any other championships and with his National Team. It is however précised and agreed by the parties, that at the signature date of this Agreement, LE COQ SPORTIF is still in the process of developing a high performance basketball shoe which will be used by the PARTNER during his professional activity. As this process is not achieved yet, LE COQ SPORTIF agrees that the PARTNER may continue to wear his actual shoe model (branded "NIKE" and no other model, including any others models branded "NIKE") during its professional activity (official and non official games) for a period of time which cannot extend beyond March 30, 2008. During this period the PARTNER agrees to play tests and participate, with regular

feedbacks and information to LE COQ SPORTIF's managers, to the development of this LE COQ SPORTIF performance shoe. From the LE COQ SPORTIF's performance shoe acceptance by the PARTNER and in any case not beyond March 30, 2008, the PARTNER will exclusively wear the LE COQ SPORTIF footwear PRODUCTS during its professional activity.

The PARTNER also agrees to wear the EQUIPMENTS and more particularly the textiles PRODUCTS provided by LE COQ SPORTIF in every circumstance (interviews, physical presence on trade shows, communication events and more generally any circumstances involving Medias and private life). PARTNER agrees in advance that a repeated breach of this obligation, noticed by LE COQ SPORTIF, grants to LE COQ SPORTIF the right to request penalties, to be fixed on the basis of the importance and the circumstances of the noticed breaches.

The sending or deliveries of the EQUIPMENTS covered by this Article 6.2 shall be carried out at LE COQ SPORTIF's exclusive expense, to the address indicated to the latter by the PARTNER and on the dates that will be fixed by joint agreement for each contractual year.

The type of EQUIPMENTS provided shall be determined by LE COQ SPORTIF in conjunction with the PARTNER, who will together choose the EQUIPMENTS in the collections of PRODUCTS developed by LE COQ SPORTIF.

## ARTICLE 7 – CONTRACTUAL PERIOD - RENEWAL

The contract is entered into for a period commencing on October 1, 2007 and ending on September 30, 2013 (the Termination Date).

Two options may occur at the Termination Date:

a) Both LE COQ SPORTIF and the PARTNER have the unilateral and unequivocal option to confirm the termination of this Agreement at its Termination Date. If LE COQ SPORTIF or the PARTNER or both parties would confirm the termination, this contract will be terminated in full right, without notice or financial compensation for any parties and PARTNER will be free to sign a new agreement with any another sporting company. PARTNER will not receive the 13.821 shares mentioned in point 6.1.2.4 (iii) but will receive the Deferred Payments as mentioned in point 6.1.2.1.

b) Both LE COQ SPORTIF and the PARTNER jointly agree to continue this Agreement for an additional three (3) years period starting on October 01, 2013 and ending on September 30, 2016. In that case, the PARTNER would receive the 13.821 shares mentioned in point 6.1.2.4 (iii) and would agree to forfeit the total amount of the Deferred Payments (i.e. 1,200,000.00 $) which would be replaced by a new basic remuneration of 1,000,000.00 $ per new year, payable in four rates of 250,000.00 $ each, on December, March, June and September of each new year.



## ARTICLE 8 – EARLY TERMINATION

### 8.1 Early termination by the PARTNER:

At the end of the third contractual year the PARTNER will have an option, at his own discretion and benefit, to early terminate this Agreement for any reason, provided however that PARTNER will notify such early termination to LE COQ SPORTIF, by written notice, at least 90 (ninety) days (i.e. before July 01, 2010) before the end of the third year.

### 8.2 Early termination by LE COQ SPORTIF:

8.2.1. During the first six (6) months of the fifth contractual year LE COQ SPORTIF will have an option to early terminate this Agreement, in case of accrual of one of the below reasons during any of the preceding four contractual years:

   (i) PARTNER became seriously injured or was unable to play in the NBA championship for one full season; or

   (ii) PARTNER did not reach the substantial level of play for a comparable NBA player in endorsement value; or

   (iii) PARTNER failed to cooperate and coordinate his schedule to work successfully with LE COQ SPORTIF in the marketing and promotion of LE COQ SPORTIF's basketball shoes and apparel.

Being précised that if LE COQ SPORTIF would exercise this early termination right, due to the accrual of one of the above conditions, the PARTNER would be entitled to receive a pro rata of the 27.640 shares that he would receive at the end of the sixth contractual year and a pro rata of the Deferred Payments.

8.2.2. Furthermore, LE COQ SPORTIF has the option to terminate this contract, without notice period, by simple written notification to the PARTNER, at any time during the CONTRACTUAL PERIOD and every eventual renewed period:

   - If PARTNER is terminating permanently his activity of professional basketball player in the NBA, due to a permanent physical or mental incapacity, an exclusion from all the NBA's franchises or PARTNER's own choice of life.

   - If the PARTNER signs a similar partnership contract with another sport equipment manufacturer during the CONTRACTUAL PERIOD, without LE COQ SPORTIF's prior consent and/or if the PARTNER wears in his professional activity any sport equipments others than the EQUIPEMENTS, with the exception of the developing period stated in Article 4 herein.



- If the RIGHTS OF THE PERSONALITY of Mr Joaquin NOAH, as a public person, are seriously harmed by his behaviour, his attitude, or his statements, resulting in the PARTNER's conviction of a felony.

- Should the PARTNER die. Being précised that in that case LE COQ SPORTIF agrees to finish paying to the PARTNER's assignees the basic remuneration linked to the year during which the death occurred.

Any waiver by LE COQ SPORTIF of the accomplishment of one of the rights or options hereby required of the PARTNER shall not be deemed as permanent waiver and it will always be possible for LE COQ SPORTIF to request the strict application of the clauses at a later date.

## ARTICLE 9 – DECLARATION – CONFIDENTIALITY

Nothing in this contract may be construed as creating any subordination relationship between LE COQ SPORTIF and the PARTNER. The two parties undertake not to disclose the content of the agreements entered into, unless demanded by legal, judicial or tax authorities.

## ARTICLE 10 – WARRANTEE – ASSIGNMENT

The PARTNER warrantees that he is free to enter into this agreement, that he has not granted identical rights elsewhere and that he will not assign it, transform it or otherwise alienate it.

For its part, LE COQ SPORTIF shall have the right to assign or sublicense, with PARTNER's prior approval, all or part of this contract to any subsidiary of the LE COQ SPORTIF Group, provided that LE COQ SPORTIF's obligations to the PARTNER have been performed.

## ARTICLE 11 – ENTIRE CONTRACT

This contract constitutes the entire agreement between the parties and may only be modified by an amendment signed by all of the parties hereto.

This agreement cancels and replaces all prior verbal or written agreements, whether express or tacit, entered into between the parties.

If any one of this contract's provisions is declared or becomes void, the other provisions shall continue to be valid. In this case, the parties shall replace it with an appropriate provision that reflects the parties' intention at the time of the document's signing.



## ARTICLE 12 – NOTIFICATIONS

All notifications hereby required are deemed to be sufficient if they have been sent by registered mail with return receipt with sufficient postage, to the address of the party which is the notification's recipient for LE COQ SPORTIF and the Chicago Bulls address with copy to the AGENT's address for the PARTNER, or if they have been delivered in person to said party in exchange for receipt, to the address mentioned above, or to any other address notified at a later date by said party. The date of the first presentation will be considered as the notification date.

## ARTICLE 13 – TERMINATION EFFECTS

In case of early termination or non-renewal after the Termination Date term, LE COQ SPORTIF must send to the PARTNER a detailed statement of its remaining stocks of products bearing the name "*Joaquim NOAH*". LE COQ SPORTIF will benefit of a six (6) months period from the termination date in order to sale out its stocks under this Agreement rules and most particularly the LE COQ SPORTIF's obligation to pay the royalty rate of 5% stated in Article 4, paid at the termination of this sale out period.

With the exception of the granted sale out period, LE COQ SPORTIF will cease, from the Termination Date and/or early termination date, all uses of the RIGHTS OF THE PERSONALITY and will stop to manufacture any new products bearing the name "*Joaquim NOAH*".

## ARTICLE 14 – ASSIGNMENT OF JURISDICTION

In the event of any dispute or difference arising out of or relating to this Agreement or the breach thereof, the parties hereto shall use their best efforts to amicably settle such disputes or differences. To this effect, the parties agree to consult and negotiate with each other in good faith toward reaching a just and equitable solution satisfactory to all parties. Should the parties be unable to reach a solution within a period of thirty (30) calendar days after commencement of discussions (discussions to begin on the day notice is given) then all disputes or differences arising in connection with this Agreement shall be settled under the following rule:

The party initiating the proceeding shall determine the forum where the litigation will be conducted, i.e.:

- If the proceeding is started by PARTNER, the litigation will be held under the United States of America's laws and jurisdiction is expressly assigned to a competent court in Washington, District of Columbia (USA).

- If the proceeding is started by LE COQ SPORTIF, the litigation will be held under French laws and jurisdiction is expressly assigned to the Commercial Court of Paris (France).



15

Done in 2 copies
In
The

LE COQ SPORTIF
Mr Antoine SATHICQ

PARTNER
Mr Joaquim NOAH

SEPT. 15, 2007

AGENTS
Mr Donald L. DELL

Donald Dell
SEPT. 15, 2007